STEVEN G. KALAR
Federal Public Defender
HANNI M. FAKHOURY
Assistant Federal Public Defender
1301 Clay Street, Suite 1350N
Oakland, CA 94612
(510) 637-3500
hanni_fakhoury@fd.org

Attorneys for FRANCISCO GONZALEZ

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FRANCISCO GONZALEZ,<br><br>Defendant. | CR 16-117-JSW<br><br>DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE |

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................ 1

STATEMENT OF FACTS .............................................................................................................. 2

A.   Mr. Gonzalez's History and Characteristics. ...................................................................... 2

B.   Nature and Circumstances of the Offense. .......................................................................... 6

ARGUMENT ................................................................................................................................... 8

A.   Seriousness of the Offense, Respect for the Law and Providing Just Punishment. ................ 9

B.   Deterring Criminal Conduct and Protecting the Public. ........................................................ 9

C.   Providing Training, Medical Care or Other Treatment. ...................................................... 10

D.   The Guidelines Sentencing Range and the Sentencing Commission's Policy
      Statements. ......................................................................................................................... 11

E.   Avoiding Unwarranted Sentencing Disparities. ................................................................. 11

CONCLUSION ............................................................................................................................. 16

# TABLE OF AUTHORITIES

## Cases

*California v. Brown*, 479 U.S. 538 (1987) .................................................................................. 1

*Gall v. United States*, 552 U.S. 38 (2007) ........................................................................... 8, 9, 11

*Tapia v. United States*, 564 U.S. 319 (2011) ............................................................................. 10

*United States v. Amezcua-Vasquez*, 567 F.3d 1050 (9th Cir. 2009) ........................................... 11

*United States v. Bad Marriage*, 392 F.3d 1103 (9th Cir. 2004) ................................................ 10

*United States v. Barker*, 771 F.2d 1362 (9th Cir. 1985) .............................................................. 8

*United States v. Boykin*, 785 F.3d 1352 (9th Cir. 2015) ............................................................ 13

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc) ................................................. 8

*United States v. Johnson*, 529 U.S. 53 (2000) ........................................................................... 11

*United States v. Torres*, 563 F.3d 731 (8th Cir. 2009) .............................................................. 13

*United States v. Vega-Ortiz*, 822 F.3d 1031 (9th Cir. 2016) ..................................................... 10

*Williams v. New York*, 337 U.S. 241 (1949) ................................................................................ 8

## Statutes

18 U.S.C. § 3553 ................................................................................................................ 8, 10, 11

18 U.S.C. § 3582 ......................................................................................................................... 10

21 U.S.C. § 841 ........................................................................................................................... 12

21 U.S.C. § 843 ........................................................................................................................... 12

California Health and Safety Code § 11378 ............................................................................... 10

## United States Sentencing Guidelines ("U.S.S.G.")

U.S.S.G. § 2D1.1 ................................................................................................................... 12, 13

U.S.S.G. § 2L1.2 ......................................................................................................................... 10

U.S.S.G. § 4B1.1 ......................................................................................................................... 14

U.S.S.G. § 4B1.2 ......................................................................................................................... 10

U.S.S.G. § 5K1.1 ......................................................................................................................... 12

**Other Authorities**

U.S. Sentencing Commission, *Report to the Congress: Career Offender Sentencing Enhancements* (August 2016) *available at* http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf .................................. 14

# INTRODUCTION

Francisco Gonzalez never had a chance. Before he was even born, there was a strong likelihood that he would be physically abused the moment he came into the world. His father had been savagely beaten and abused by his own father—Mr. Gonzalez's grandfather—and left to fend for himself in the world alone. Mr. Gonzalez's father inherited those violent tendencies and lashed out at his three oldest children, ruining any hope Mr. Gonzalez had for a "normal" family life. Mr. Gonzalez's older sister emancipated from her family and escaped to salvage a "normal" life for herself. Mr. Gonzalez's older brother, could not escape his demons and wound up deported and living in Mexico. Mr. Gonzalez, in the absence of his father and older siblings, tried to become the man of the house as a young teenager, taking care of his two younger sisters. But missing any role models or familial guidance, Mr. Gonzalez succumbed to the influences of negative peers and drug abuse and now faces a critical point in his young life.

At 25 years old, Mr. Gonzalez is about to embark on a decade long prison sentence that will, in the best case scenario, have him spend the next two presidential elections incarcerated and which will result in his release from prison when his five year old daughter is preparing to celebrate her 16th birthday. Mr. Gonzalez acknowledges in his letter to the Court that he "can't blame no one but myself for being in this position." Exhibit A, September 6, 2016 Letter of Francisco Gonzalez. But at his sentencing, Mr. Gonzalez's mistakes must be understood in the context of his family history, as "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, concurring).

The probation office recognizes a significant downward variance is appropriate in this case, recommending a 132 month sentence to account for Mr. Gonzalez's traumatic upbringing and the fact he has only prior jail sentence of 240 days—served at half time—before this case. Mr. Gonzalez completely agrees with the probation office's conclusion but asks the Court to vary downward a little more to the 120 month mandatory minimum sentence that applies.

-1-
DEFENDANT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD VARIANCE
CR 16-117-JSW

**STATEMENT OF FACTS**

**A.      Mr. Gonzalez's History and Characteristics.**

Mr. Gonzalez suffered physical abuse that broke up his family and placed him on a path of self destruction that now lands him in federal court.  His older sister, Meribe, emancipated from her family at the age of 17 and has since led a successful and happy life.  *See* Exhibit B, Declaration of Madeline Larsen ("Larsen Dec.") ¶¶ 7-8.  Mr. Gonzalez was not so lucky.

Mr. Gonzalez had the same chance to escape physical abuse that his father, Felipe Gonzalez Sr., had, which is none at all.  Felipe Sr. was kicked out of his home at the age of five and lived on the streets. After he was raped by force by another boy in the street, he walked for 12 hours to live in another town. When he finally returned home, his father would beat him with an "electric cable." The abuse continued until Felipe Sr. would leave the home for stretches of time between the ages of 6 and 8. He eventually lived with an aunt for several years, before returning home as a teenager and leaving the house to live on his own at the age of 17.  Exhibit C, May 1, 2001 Disposition Report at p. 11.[1]  The abuse Felipe Sr. received at the hands of his father was sadistic: "the abuse consisted of beatings with an electric cable, horse whips, sticks and switches." Felipe Sr. would be hung "by his ankles from a beam on the ceiling" while his father beat him. His father also "put his hands on the stove and burn[ed] his hands, put his hands into scaling hot water and burn[ed] his hands, and threw a bucket of cold water if he did not wake up by three in the morning to set up the stall in the flea market. When he was young his father would put him out onto the street with his legs tied with ropes. The other children would make fun of him." As a result, Felipe Sr. became "from the age of seven onwards…very aggressive," "learned to defend himself" and "was frequently in fights."  Exh. C at p. 12; Presentence Investigation Report ("PSR") ¶ 47.

It was not just Mr. Gonzalez's father who experienced physical abuse.  Mr. Gonzalez's mother, Jeorgina, was disciplined by her mother by "hitting her with or throwing a shoe or slipper at her." At the age of 6, she was sent by her parents to live with her godmother, who was an alcoholic. The godmother's boyfriend sexually abused and raped Jeorgina.  Exh. C at p. 11; PSR ¶ 47.

---

[1] All exhibits from Mr. Gonzalez's two Contra Costa County dependency cases have been redacted to remove dates of birth, addresses and phone numbers.

-2-
DEFENDANT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD VARIANCE
CR 16-117-JSW

It is therefore no surprise that Felipe Sr. was physically abusive to his children too. For Mr. Gonzalez, the physical abuse began when he was three years old. By 2001, when Mr. Gonzalez was nine years old, the Contra Costa County Social Services office opened its first dependency case for the Gonzalez. The case was initiated by Mr. Gonzalez's older sister Meribe. PSR ¶ 45. As documented in social services reports, the children told the Concord police department in March 2001 that "they feared their father greatly. The children stated that the last thing they wanted to do was make their father angry, fearing their father would hurt them." Exh. C at p. 10; PSR ¶ 47. For Mr. Gonzalez, that included having Felipe Sr. hitting Mr. Gonzalez, who was 9 years old at the time, "with a belt causing bruising to the child's inside upper left upper leg. The father also punched the child in the stomach," "pinched and pulled the child's left ear" and has "a history of using physical discipline including slapping, spanking and punching the child who is afraid of the father." Exh. C at p. 6; PSR ¶ 46. The physical abuse was more than what was reported and documented to Social Services; the children's fear of their father—and their mother's unwillingness to report her own physical abuse at the hands of her husband—prevented the children from coming forward sooner or in more detail. *See* Exh. B, Larsen Dec. ¶ 3.

The opening of the dependency file resulted in two years of therapy, counseling and monitoring through Contra Costa County social services. Meribe ultimately left the home was placed in foster care and group homes and eventually emancipated from her family at the age of 17. *See* Exh. B, Larsen Dec. ¶ 7; *see also* PSR ¶ 45. Leaving her family home allowed Meribe to thrive. Freed from her parents, she not only had access to much needed services like counseling, but she also had access to positive mentors and role models. She attended the University of California, Berkeley though never graduated. Instead, she focused her energy and attention to working in youth services, including working for California Youth Connections[2] and the Larkin Street Youth Center.[3] She eventually married and is now a full time homemaker, taking care of her two small children.

---

[2] California Youth Connections is an organizations that focuses on policy and youth development surrounding the California foster care system. *See* http://www.calyouthconn.org/home.

[3] Larkin Street Youth Center is an organization that provides services for homeless youth living on the streets of San Francisco. *See* http://larkinstreetyouth.org/.

-3-
DEFENDANT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD VARIANCE
CR 16-117-JSW

She is candid that if she had not left her family home, she would not have the successful and fulfilling life she leads now.  Exh. B, Larsen Dec. ¶¶ 7-8.

Mr. Gonzalez was not so lucky.  By February 2002, a social services report concerning him showed that although he is in the fifth grade, "his academic functioning is at the second grade level." Although his parents were directed by the court to begin counseling, he had not yet started "because of the parent's problems with scheduling and transportation."  Yet, despite the turmoil in the house and his troubles at school, Mr. Gonzalez's teacher reported "he is likable and positive."  Exhibit D, February 28, 2002 Status Review Report at p. 9

Mr. Gonzalez wanted to keep his family intact, to the point that "when interviewed by the social worker the child [Francisco] tends to deny and minimize problems in the home." *Id*. at p. 9; PSR ¶ 48.  By the time Mr. Gonzalez finally got to see therapist Carla Haimowitz, she believed "the chances of Francisco or Felipe [Jr.] revealing future abuse to an adult are slim. Indeed, it was only the reluctant revelation by their sister that got services to this family in the first place."  Exhibit E, July 19, 2002 Email from Carla Haimowitz to Kimberly Shaw.  The difficult home life had not gotten any easier despite more than a year of counseling but despite the turmoil, his therapist wrote that "Francisco is absolutely delightful. He is handsome, charming, polite, curious, open, and eager to connect. I think Francisco has a good start on the therapy, and has begun to use it appropriately." *Id.*

Unfortunately, Mr. Gonzalez would not get to continue with therapy very long; the dependency case was terminated in 2003 and Mr. Gonzalez was left to fend for himself, this time without his sister's presence.  Without social services checking in on Mr. Gonzalez's family, the limited progress that had been made in two years of dependency evaporated and Felipe Sr. returned to his physically abusive ways.

In 2006, a second Contra Costa County Dependency case was opened for the Gonzalez family. Social Services was brought in after Felipe Sr. attacked Mr. Gonzalez's older brother, Felipe Jr., with a paint pole and kicked him in the groin and head. This attack was witnessed by Mr. Gonzalez, who was 15 years old at the time, and his two youngest sisters.  The case resulted in a restraining order against Felipe Sr. who left the house for several years.

With his father gone, his mother working full time to support the family, and his older brother having emotional and behavioral problems at school that resulted in his incarceration, Mr. Gonzalez took it upon himself to be the man of the house. A March 2007 social services report noted that 15 year old Mr. Gonzalez "appears to be a very responsible young man. He comes home from school during the week to watch his two younger sisters until his mother is off work. Francisco works weekends and during the summer to earn extra money for his extra curricular activities and to help his mother around the house. Francisco sees himself as the man of the house, and feels responsible for his mother and younger sisters." And although Mr. Gonzalez had struggled in school and had an Individualized Educational Plan for several years, he was "doing well in his classes" and "[was] on the school baseball team and [was] part of the starting line up." Exhibit F, March 20, 2007 Disposition Report at p. 9; PSR ¶¶ 49, 56. A month later, Mr. Gonzalez passed all of his classes except English, which he repeated in summer school and received an "A." The high school "see[s] improvement to the extent Francisco may be able to attend all regular education classes in the future." He continued to play baseball and even started playing football but quit in order to concentrate on baseball. Although he expressed hesitation about attending individual therapy, he told his social worker that he was "willing to do family therapy with his father." Exhibit G, October 5, 2007 Status Review Report at p. 7-8.

But it was hard for Mr. Gonzalez to manage the stress at home with the adolescent stresses of high school. He had begun drinking alcohol and smoking marijuana at the age of 8. By 12 years old, he was using cocaine. PSR ¶ 55. He had no positive role models in his life; his sister was gone, and his brother, who was a volatile and angry man, was in and out jail. Mr. Gonzalez began spending time with an older and more negative crowd. Mr. Gonzalez's positive strides gradually evaporated.

In the spring of 2008, Mr. Gonzalez got into a fight in school. It was the first time that Mr. Gonzalez, who had been victimized throughout his childhood by his father, emulated his father's violence. Mr. Gonzalez's father—who had abused his helpless children to the point that his oldest daughter abandoned the family and the children told the police they were afraid of him—received minimal criminal punishment for this abuse, and was provided extensive counseling and therapy

1   services by Contra Costa County.  Mr. Gonzalez, on the other hand, was sent to juvenile hall at the
2   age of 17 for several months, where he was surrounded by traumatized and dangerous children.
3      The next few years would be trying ones for Mr. Gonzalez.  His father eventually reconciled
4   with his mother, and returned to the family home.  In the absence of long term counseling, the
5   relationship between father and son was irreparably damaged, though less physically abusive now
6   that Mr. Gonzalez was older and physically bigger.  At the age of 19, Mr. Gonzalez became a father
7   to a young girl and struggled to find work and provide for her, as his daughter's mother was unstable
8   and unable to care for her.  PSR ¶¶ 52, 57.  By 2014, when Mr. Gonzalez was 22, he obtained his
9   first two felony convictions, and served his only prior jail sentence: 240 days in Contra Costa County
10  jail—of which he only actually served half that time, approximately 120 days—for crimes involving
11  drugs and firearms.  *Id.* ¶¶ 34-35.  His older brother was involved in both cases and has since then
12  been deported to Mexico, the second Gonzalez sibling that escaped from the family.

13  **B.** **<u>Nature and Circumstances of the Offense.</u>**

14     By the summer of 2015, Mr. Gonzalez was living at home with his parents, sleeping on the
15  couch, and feeling financial stress on all sides.  PSR ¶¶ 18, 52.  As his daughter's mother struggled
16  to take care of his daughter, Mr. Gonzalez fought for full custody but struggled to provide for her.
17  *Id*. ¶ 55; *see also* Exh. B, Larsen Dec. ¶ 11.  His father criticized him about living in his house and
18  not working full time, making Mr. Gonzalez feel like a failure for asking his parents for help.  *Id*. ¶
19  11.  Mr. Gonzalez was attending school to become a solar panel installer, but still had months to go
20  before he would complete the course and begin the arduous process of finding a job.

21     It was no surprise that when an ATF confidential informant reached out looking for drugs,
22  Mr. Gonzalez took the bait.  Over eight transactions the ATF purchased methamphetamine and, once
23  Mr. Gonzalez's access to that drug had dried up, whatever firearms Mr. Gonzalez could scavenge
24  from others.  PSR ¶¶ 6-14.  The ATF informant was relentless, constantly texting Mr. Gonzalez when
25  he was at school to set up deals and buys.  When the ATF ultimately arrested Mr. Gonzalez almost
26  one year to the day of his sentencing, they did not find any firearms in his person or car.

Once a federal criminal defendant, Mr. Gonzalez accepted responsibility for his actions. He saved both the government and the Court resources by waiving his rights to a detention hearing, a grand jury indictment, and to file pretrial motions. He pleaded guilty under a plea agreement that waives his right to appeal any part of his case, including his sentence.

Mr. Gonzalez will now have to deal with the consequences of his decisions. He will spend at least the next ten years in prison, and when he is released his five year old daughter will hopefully still be a teenager, and not in her early 20s. He hopes he can have a meaningful relationship with her, but knows it will be challenging. As he writes in his letter to the court, he feel "as though I have failed tremendously in our society and also have let my family down." Exh. A; *see also* PSR ¶ 18.

Mr. Gonzalez cannot blame anyone—not his father, brother or Contra Costa County Social Services—for being in this position because ultimately he was the one who sold drugs and firearms to the ATF. While no one disputes that Mr. Gonzalez has lived a difficult, turbulent and challenging life, he has also been in a criminal defendant before, receiving probation and county jail sentences. But while Mr. Gonzalez had limited access to counseling, therapy and drug treatment as a young child, he has sorely missed having positive role models and mentors around him, including his older siblings. *See* Exh. B, Larsen Dec. ¶ 10.

Mr. Gonzalez must be harshly punished for his actions and by agreeing to waive indictment to be charged by Information, he has consented to serving at least ten years in prison. The sole question remaining for this Court then is whether adding an extra year in prison—as recommended by the probation office—or five years in prison—as recommended by the government—on top of this ten year minimum sentence will further the sentencing goals of providing just punishment, ensuring general and specific deterrence, and preventing unwarranted sentencing disparity. As explained below, the answer to that question is no: a ten year prison sentence is enough to punish Mr. Gonzalez for his behavior and motivate him to turn his life around for good.

-7-
DEFENDANT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD VARIANCE
CR 16-117-JSW

## **ARGUMENT**

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The factors detailed in 18 U.S.C. § 3553(a) assist the Court in fulfilling this mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). The sentence recommended in the U.S. Sentencing Guidelines ("U.S.S.G.") is only one factor for district courts to consider in making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

As recognized by the probation officer, a downward variance from the advisory Guideline range is appropriate in this case, and the probation officer recommends a 132 month sentence. Mr. Gonzalez asks this Court to vary downward a little further to the 120 month mandatory minimum sentence he must serve. Considering all of the § 3553(a) factors, a 120 month sentence achieves the three primary goals of sentencing: (1) it is a significant and harsh prison sentence that will deter the public generally, and Mr. Gonzalez specifically, from engaging in drug and firearms trafficking; (2) it takes into account Mr. Gonzalez's specific history and characteristics, including his traumatic and abusive upbringing and the fact he has only served one short jail sentence prior to this case; and (3) it avoids unwarranted sentencing disparity with other defendants arrested in controlled-buy cases conducted by the ATF in the summer of 2015, as well as avoids equating Mr. Gonzalez with drug trafficking career offenders sentenced across the country and in the Northern District of California specifically, who routinely receive sentences far below the 188 month sentence recommended by the government despite their more significant criminal histories.

**A.     Seriousness of the Offense, Respect for the Law and Providing Just Punishment.**

There is no question that methamphetamine is a horrible, debilitating drug, and that combining this drug with guns only makes matters worse. Mr. Gonzalez recognizes he has made a serious and terrible mistake and understands and accepts that he must receive a significant sentence as punishment.

But ten years in prison is long enough. The Supreme Court has warned that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted). Ten years severely punishes Mr. Gonzalez with a lengthy prison sentence, while taking into account the fact that Mr. Gonzalez is only 25 years old, has only been to jail once for 240 days—of which he only actually served half—and endured significant abuse and trauma growing up.

The probation officer agrees, noting that a downward variance is appropriate in this case due to the fact that the 120 month mandatory minimum sentence that applies here is "exponentially higher" than the sole prior jail sentence Mr. Gonzalez has served. PSR ¶ 81; Sentencing Recommendation at 2.

**B.     Deterring Criminal Conduct and Protecting the Public.**

In addition to punishing Mr. Gonzalez for his behavior, a 120 month sentence sends a strong message to other people thinking of engaging in drug and firearm sales that they will be arrested, prosecuted and sentenced to a lengthy prison term.

Regarding specific deterrence, Mr. Gonzalez's involvement in the federal criminal justice system has scared him straight. Until this case, he had only been sentenced to a total of 240 days in jail—of which he actually served less than four months—in two prior cases, with the sentences in both cases running concurrently. PSR ¶¶ 34-35. The sentence he will receive in this federal prosecution is, in the probation officer's own words, "exponentially higher." *Id.* ¶ 81. In fact, the almost one year in pretrial detention he has served since his arrest is four times as long this sole prior jail sentence.

Moreover, Mr. Gonzalez recognizes that prison sentences only go up. If he receives a 120 month sentence now, he understands that getting involved in drug and firearms trafficking in the future will result in an even longer prison sentence. In fact, should Mr. Gonzalez commit another drug trafficking crime once released from prison, he runs the risk of being labelled a career offender if he is charged federally, as his prior California state drug conviction may qualify as a "controlled substance offense" for purposes of the career offender Guidelines. *See United States v. Vega-Ortiz*, 822 F.3d 1031, 1036 (9th Cir. 2016) (California Health and Safety Code § 11378 is "felony drug trafficking offense" under U.S.S.G. § 2L1.2(b)(1)(B), which is identical to definition of "controlled substance offense" under U.S.S.G. § 4B1.2).

C. **Providing Training, Medical Care or Other Treatment.**

"The underlying purposes of sentencing include not only punishment and deterrence, but also the provision of treatment to a defendant in need of it." *United States v. Bad Marriage*, 392 F.3d 1103, 1114 (9th Cir. 2004) (citing 18 U.S.C. § 3553(a)(2)(D)). In considering the § 3553(a) factors, however, Congress has cautioned courts to recognize that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). The Supreme Court has explained this means a district court cannot increase the length of a sentence in order to provide a defendant with rehabilitative services. *See Tapia v. United States*, 564 U.S. 319, 327 (2011) (a court determining the length of a prison sentence "should consider the specified rationales of punishment *except for* rehabilitation, which it should acknowledge as an unsuitable justification for a prison term.") (emphasis in original).

A 120 month sentence is long enough to allow Mr. Gonzalez to participate in the BOP's Residential Drug Abuse Program ("RDAP"). Just as critical, the five year term of supervised release that Mr. Gonzalez will serve under the watchful eye of the probation office after he is released will be more effective than prolonged incarceration to ensure Mr. Gonzalez continues to receive the drug treatment aftercare he needs to live a successful and law abiding life outside of prison. Indeed, "Congress intended supervised release to assist individuals in their transition to community life. Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United*

1   *States v. Johnson*, 529 U.S. 53, 59 (2000) (citing 18 U.S.C. § 3553(a)(2)(D)).  Getting Mr. Gonzalez
2   on supervised release as soon as possible is the best way to provide Mr. Gonzalez with rehabilitative
3   tools to return to a law abiding life.

### D.   The Guidelines Sentencing Range and the Sentencing Commission's Policy Statements.

The parties all agree on the Guideline range, which puts Mr. Gonzalez at a final adjusted offense level of 33 and a criminal history category of IV.  *See* PSR ¶¶ 30, 38.[4]  Thus, the advisory Guideline range is between 188 and 235 months.  *Id.* ¶ 62.

### E.   Avoiding Unwarranted Sentencing Disparities.

While the Court must avoid unwarranted sentencing disparities among defendants with similar records who are convicted of similar conduct, the Ninth Circuit has explained sentencing courts must also "avoid 'unwarranted *similarities* among [defendants] who were not similarly situated.'"  *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting *Gall*, 552 U.S. at 55 (emphasis and brackets in original)); *see also* 18 U.S.C. § 3553(a)(6).

The 188 month sentence recommended by the government treats Mr. Gonzalez disparately from two other classes of defendants.  First, a 188 month sentence would treat Mr. Gonzalez differently than many of the other defendants arrested in the summer of 2015 as part of a series of ATF controlled-buy operations in the East Bay.

---

[4] Mr. Gonzalez has seven criminal history points, the minimum point total required to fall into criminal history category IV.  PSR ¶ 38.  The conviction that tips Mr. Gonzalez over the edge from category III to IV—and the Guideline range from 168-210 to 188-235 months—is a reckless driving misdemeanor conviction from 2011 for which Mr. Gonzalez served one day in jail.  *Id.* ¶ 33.

-11-

| TABLE 1: NDCA OAKLAND VENUE 2015 CONTROLLED BUY CASES[5] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name | Case No. | Buys | Guns | Drug Quantity | Mand. Min. | Sentence | Notes |
| Anton Coker | 15-421-JSW | 4 | 5 | 26.9g crack cocaine | N/A | 108 months | Prior prison sentences |
| Anthony Conner | 15-464-JD | 3 | 5 | N/A | N/A | 33 months | |
| Joseph Conner | 15-296-HSG | 3 | N/A | 2,041g methamphetamine | None | | |
| Brandon Cooper | 15-406-JST | 4 | N/A | 327 ecstasy pills 116g crack cocaine | None | 57 months | Prior prison sentences |
| Joh'ronnie Cotton *Career offender | 15-449-JSW | 2 | N/A | 141g methamphetamine | 60 months | 80 months | Prior prison sentences |
| Bobby Henry | 15-460-JD | 1 | N/A | 28g crack cocaine | N/A | 30 months | Prior prison sentences |
| Andres Jaregui | 15-480-HSG | 2 | 19 | N/A | N/A | | |
| Marco Mora-Reynosa | 16-106-JST-2 | 1 | N/A | 4.9kg methamphetamine | None | 36 months | |
| Fernando Paez-Lazcano | 16-106-JST-1 | 5 | 2 | 5.4kg methamphetamine 84g heroin | None | 48 months | |
| Damien Thomas | 15-450-YGR | 2 | N/A | 87g methamphetamine | 60 months | 60 months | Prior prison sentences |
| Clarence Trapps | 15-382-JSW | 6 | 1 | 96.6g crack cocaine 318.3g methamphetamine | 120 months | 135 months | Prior prison sentences |
| Taj Williams | 15-422-JSW | 2 | 1 | 29.7g crack cocaine | None | 30 months | |
| **Francisco Gonzalez** | **16-117-JSW** | **8** | **9** | **973g methamphetamine 15g powder cocaine** | **120 months** | | **No prison sentences** |

The table highlights a glaring difference in the number of controlled buys between Mr. Gonzalez and the other defendants. Excluding Mr. Gonzalez, the average number of controlled buys in these cases is approximately three. The ATF, however, conducted eight controlled buys from Mr. Gonzalez, shifting from drugs to guns once Mr. Gonzalez ran out of methamphetamine to sell. That shift, played a dramatic role in the Sentencing Guidelines calculation that apply here. The first drug sale of 57 grams of actual methamphetamine triggered a ten year mandatory minimum sentence and a base offense level of 30 under the Sentencing Guidelines. PSR ¶ 6; *see* 21 U.S.C. § 841(b)(1)(A)(viii); U.S.S.G. § 2D1.1(c)(5). But by not arresting Mr. Gonzalez right there—or even after three sales, the average number of sales in other controlled purchase cases—the offense level steadily rose as the agents continued to buy. By the fourth transaction, the quantity of

---

[5] The tables in this sentencing memorandum were compiled by reviewing the complaints, indictments and sentencing pleadings filed on the PACER docket in the specific cases listed in the table. Cases where it appeared from the docket that the defendant received a U.S.S.G. § 5K1.1 departure for providing substantial assistance to the government (*i.e.*, sealed filings, no sentencing memorandum available on the public docket, the defendant was convicted of 21 U.S.C. § 843(b) phone counts) were generally not included.

1   methamphetamine increased the offense level to 34.  *See* PSR ¶¶ 6-10 (total of 530 grams actual
2   methamphetamine purchased after four transactions); U.S.S.G. § 2D1.1(c)(3) (base offense level of
3   34 for offenses involving between 500 grams and 1.5 kilograms of actual methamphetamine). After
4   Mr. Gonzalez ran out of methamphetamine to sell, the agents asked him to supply firearms, which
5   added another two levels to the offense level.  *See* U.S.S.G. § 2D1.1(b)(1).  ATF's decision to not
6   arrest Mr. Gonzalez until eight transactions had been completed resulted in his Guideline range
7   increasing from 100-125 months after the first drug sale to the current Guideline range of 188-235
8   months at a criminal history category IV.

9   The Court should grant a downward variance to account for this sentencing manipulation.
10  The Ninth Circuit has explained that "'sentencing manipulation' occurs when the government
11  increases a defendant's guideline sentence by conducting a lengthy investigation which increases the
12  number of drug transactions and quantities for which the defendant is responsible." *United States v.*
13  *Boykin*, 785 F.3d 1352, 1360 (9th Cir. 2015) (quoting *United States v. Torres*, 563 F.3d 731, 734
14  (8th Cir. 2009)).  To prove "sentencing manipulation," a defendant must demonstrate "'that the
15  officers engaged in the later drug transactions solely to enhance his potential sentence.'" *Boykin*,
16  785 F.3d at 1360 (quoting *Torres*, 563 F.3d at 734).

17  The government's decision to continue purchasing drugs may be motivated by legitimate
18  investigative concerns.  In *Boykin,* the Ninth Circuit found no sentencing manipulation as agents
19  continued to conduct controlled buys from the defendant because the two sources who had made the
20  buys were "convicted of serious offenses during the period they were acting as confidential sources
21  against the Boykins. Therefore, it was reasonable for law enforcement to extend the investigation
22  with more controlled purchases by a more credible confidential source." 785 F.3d at 1352.

23  But in a situation like the one here—where the same confidential source was involved in all
24  the transactions—there was no apparent investigative need to continue buying drugs from Mr.
25  Gonzalez or shift the sales from drugs.  *See* PSR ¶¶ 6-14.  If the sentencing court finds "sentencing
26  manipulation," it may vary downward from the Guideline range "'since such manipulation
27  artificially inflates the offense level by increasing the quantity of drugs included in the relevant
28

conduct.'" *Boykin*, 785 F.3d at 1361 (quoting *Torres*, 563 F.3d at 734-35).  Thus, in addition to his difficult upbringing and the exponential increase in punishment, Mr. Gonzalez also asks this Court to take this sentencing manipulation into account to vary downward and impose a 120 month sentence in order to avoid sentencing disparity.

A variance down to 120 months is also appropriate to avoid an unwarranted sentencing *similarity* with drug trafficking career offenders.  As this Court knows, a defendant is a career offender under the Guidelines if he has been convicted of a federal drug trafficking offense or crime of violence and has two prior convictions for either a drug trafficking offense or a crime of violence that receives criminal history points.  *See generally* U.S.S.G. § 4B1.1.  A recent report by the Sentencing Commission concerning career offenders noted that the average sentence for drug trafficking only career offenders—defendants who are career offenders only due to drug trafficking convictions as both their instant federal offense of conviction and both of their prior qualifying convictions—was 134 months.[6]  For the most serious career offenders—defendants who are career offenders by virtue of only crime of violence convictions—the average sentence was 179 months.[7]

Drug trafficking career offenders sentenced in the Northern District of California routinely receive sentences less than 188 months, even when they have trafficked in significant quantities of drugs or have previously served multiple prison sentences in the past for drug trafficking crimes.

| TABLE 2: NDCA DRUG TRAFFICKING CAREER OFFENDER CASES (EXCERPT)[8] | | | | | |
|---|---|---|---|---|---|
| **Name** | **Case No.** | **Drug Quantity** | **Guideline Range** | **Sentence** | **Notes** |
| Jose Aguilar | 13-688-LHK | 150g methamphetamine | 262-327 | 144 months | |
| Tyree Banks | 00-363-CRB 13-682-CRB | 3g crack cocaine + § 924(c) conviction | 262-327 | 72 months | Prior 151 month NDCA drug trafficking sentence |
| Eric Beverly | 05-370-WHA | 340g crack cocaine 1.3kg powder cocaine | 188-235 | 188 months | Four prior drug trafficking convictions |
| Peter Chavez | 11-331-MMC | Unknown quantity of crack cocaine + § 924(c) conviction | 322-387 | 180 months | |

---

[6] *See* Exhibit H, U.S. Sentencing Commission, *Report to the Congress: Career Offender Sentencing Enhancements* (August 2016), p. 34, Figure 13, Average Guideline Minimum and Average Sentence Imposed by Career Offender Pathway, *available at* http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf.

[7] *Id.*

[8] Table 2 is an excerpt of the larger Table 2 included as Exhibit I to this Sentencing Memorandum.

-14-

| | | | | | |
|---|---|---|---|---|---|
| Dan Couch | 13-652-CRB | 454.9g heroin | 188-235 | 60 months | Four prior drug convictions |
| Dale Cunningham | 09-62-SBA | 10g crack cocaine | 188-235 | 120 months | Five prior convictions and prior 3 year prison sentence |
| Dan Currie, Jr. | 09-1020-DLJ | 25g crack cocaine | 188-235 | 121 months | Nine prior convictions, including 6 for drug trafficking |
| Anthony Decuir | 12-557-SI | 48g crack cocaine | 188-235 | 120 months | Eleven prior convictions |
| Daniel Garcia | 10-209-EJD | 525g methamphetamine | 262-327 | 180 months | |
| Sean Godwin | 13-168-YGR | 2.7kg MDMA<br>1.2kg methamphetamine<br>705g ketamine | 188-235 | 180 months | Six prior drug trafficking convictions |
| Omar Gonzalez | 12-833-LHK | 1.5kg methamphetamine | 235-293 | 174 months | Prior convictions include sexual battery |
| Michael Green | 06-662-SBA | 175.5g crack cocaine<br>4g methamphetamine<br>73g heroin<br>+ § 924(c) conviction | 262-327 | 180 months | |
| Joseph Gutierrez | 11-108-SI | Unknown quantity of methamphetamine<br>+ § 924(c) conviction | 262-327 | 120 months | |
| Alonzo Hernandez | 12-705-YGR | 22g methamphetamine<br>+ § 924(c) conviction | 262-327 | 180 months | |
| Santiago Hernandez | 11-331-MMC | 600g crack cocaine | 188-235 | 120 months | |
| Marshawn Howard | 08-541-CW | 527g cocaine | 188-235 | 120 months | Two prior drug trafficking convictions |
| Anthony Johnston | 09-103-CRB | 2kg heroin<br>44g methamphetamine | 262-327 | 168 months | Ten prior convictions, including 13 year prison sentence |
| Khanh Ly | 13-122-CRB | 118g methamphetamine | 188-235 | 87 months | Three drug trafficking convictions between 2007-2012 |
| Javier Martinez | 09-1190-CW | 11.5kg cocaine | 262-327 | 168 months | |
| Ronald Madeiros | 07-699-CW | 170g methamphetamine | 188-235 | 144 months | Five prior drug trafficking convictions |
| Demario McDaniels | 10-680-WHA | 130g crack cocaine | 188-235 | 160 months | Four prior drug trafficking convictions |
| John Mosley | 05-533-SI | 18g cocaine | 262-327 | 120 months | Three prior drug trafficking convictions |
| Frank Powersmonachello | 09-689-JSW-3 | 500g cocaine | 188-235 | 188 months | Two prior drug trafficking convictions |
| Antonio Reyes | 09-43-DLJ | 681g methamphetamine | 262-327 | 168 months | Three prior drug trafficking convictions |
| Sean Rodgers | 14-219-RS | 199g crack cocaine | 188-235 | 84 months | Four prior drug trafficking convictions |
| Jeffrey Sardell | 15-117-JD | 350g methamphetamine<br>+ § 924(c) conviction | 262-327 | 180 months | |
| Alfred Sanchez | 14-640-CRB | 14.5g methamphetamine | 151-188 | 77 months | Two prior drug trafficking convictions; prior 6 year prison sentence |
| Timathe Soto | 13-253-PJH | 330g methamphetamine<br>+ § 924(c) conviction | 352-425 | 180 months | Eight felony convictions, including four drug trafficking convictions |

| | | | | | |
|---|---|---|---|---|---|
| Grady Walker Jr. | 10-17-PJH | 282.8g crack cocaine<br>603.1g powder cocaine | 188-235 | 120 months | Two prior 3 year prison sentences |
| Malik White | 05-570-WHA | 172g crack cocaine | 262-327 | 120 months | Three prior drug trafficking convictions with prison sentences |
| Robert Wildman | 12-672-RS | 20g heroin<br>+ § 924(c) conviction | 262-327 | 150 months | Multiple prior prison sentences |
| Deangelo Williams | 05-602-CRB | 670g crack cocaine | 262-327 | 130 months | Two prior drug trafficking convictions |

Imposing a 188 month sentence on Mr. Gonzalez, who is not a career offender and has no prior crime of violence convictions, would treat him harsher than career offenders, including violent career offenders. Instead, a 120 month sentence avoids that disparity and is consistent with recent sentences handed down in other methamphetamine cases in the Northern District of California involving defendants with criminal records who are not career offenders.

| TABLE 3: NDCA METHAMPHETAMINE CASES | | | | | | |
|---|---|---|---|---|---|---|
| Name | Case No. | Drug Quantity | Mand. Min. | CHC | Guideline Range | Sentence |
| Marc Roston | 15-98-VC | 957.9g methamphetamine | 60 months | III | 87-108 | 72 months |
| Jorge Diaz-Ruiz | 15-408-BLF | 96.6g methamphetamine<br>106.1g cocaine | 60 months | III | 108-135 | 90 months |
| Sergio Garibay | 12-177-CW | 141g methamphetamine | 60 months | IV | 151-188 | 96 months |
| Antonio Rodriguez | 15-346-HSG | 53.6g methamphetamine | 60 months | VI | 151-188 | 92 months |

To the extent these cases involved less methamphetamine than Mr. Gonzalez's offense, that difference is reflected in the 120 month mandatory minimum sentence that Mr. Gonzalez must serve.

## CONCLUSION

For these reasons, Mr. Gonzalez asks this Court to vary downward from the advisory Guideline range and impose a sentence of 120 months on each count, to run concurrent with each other. Mr. Gonzalez also requests the Court recommend he be housed in a facility outside of California where he can participate in the BOP's Residential Drug Abuse Program.

DATED:       September 6, 2016            STEVEN G. KALAR
                                          Federal Public Defender

                                                     /s/
                                          HANNI M. FAKHOURY
                                          Assistant Federal Public Defender